IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

JUAN ORNELAS,               :

     Petitioner,          :

vs.                      : CIVIL ACTION NO. 09-0634-WS-C

UNITED STATES OF       : CRIMINAL ACTION NO. 05-0321-WS
AMERICA,

                           :
     Respondent.

## REPORT AND RECOMMENDATION

Petitioner, Juan Ornelas, a federal prison inmate proceeding *pro se*, has filed a motion to vacate, set aside or correct his sentence pursuant to 28 U.S.C. § 2255 (Doc. 720; *see also* Doc. 721). This action has been referred to the undersigned for entry of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). Following consideration of all relevant pleadings in this case, it is recommended that Ornelas' § 2255 motion be denied and that it be found he is not entitled to a certificate of appealability.

## FINDINGS OF FACT

1.     On April 3, 2006, Ornelas was charged, by criminal complaint, with conspiracy to possess with intent to distribute methamphetamine ice, a

Schedule II controlled substance, in violation of 21 U.S.C. § 846. (Doc. 1) By second superseding indictment, filed in open court on April 27, 2006, Ornelas was charged with conspiracy to possess  with intent to distribute more than 50 grams of methamphetamine ice in violation of 21 U.S.C. § 846 (Count One) and possession with intent to distribute 12 ounces of methamphetamine ice in violation of 21 U.S.C. § 841(a)(1) (Count Eleven). (Doc. 104)[1]

2.      On June 6, 2006, Ornelas, through his attorney, Neil L. Hanley, Esquire, filed written notice of his intent to change his plea to guilty to Count One of the second superseding indictment. (*See* Doc. 164)

3.      On June 16, 2006, the parties filed a plea agreement and factual resume in open court. (Doc. 213) The plea agreement reads, in relevant part, as follows:

### PLEA AGREEMENT

The above[-]captioned defendant, represented by his counsel, and the United States of America have reached a Plea Agreement in this case, pursuant to Rule 11 of the Federal Rules of Criminal Procedure, the terms and conditions of which are as follows:

### RIGHTS OF THE DEFENDANT

1.      The defendant understands his rights as follows:

---

[1]      In addition, a forfeiture count, in accordance with 21 U.S.C. § 853, was asserted against Ornelas and his co-conspirators. (Doc. 104, Count Twelve)

2

      a.      To be represented by an attorney;

      b.      To plead not guilty;

      c.      To have a trial by an impartial jury;

      d.      To confront and cross-examine witnesses and to call witnesses and produce other evidence in his defense;

      e.      To not be compelled to incriminate himself.

## WAIVER OF RIGHTS AND PLEA OF GUILTY

2.      The defendant waives rights b through e, listed above, and pleads guilty to Count 1 of the Second Superseding Indictment, charging a violation of Title 21, United States Code, Section 846, conspiracy to possess with the intent to distribute methamphetamine ice, a Schedule II controlled substance.

.    .    .

3.      The defendant expects the Court to rely upon his statements here and his response to any questions that he may be asked during the guilty plea hearing.

4.      The defendant is not under the influence of alcohol, drugs, or narcotics. He is certain that he is in full possession of his senses and mentally competent to understand this Plea Agreement and the guilty plea hearing which will follow.

5.      The defendant has had the benefit of legal counsel in negotiating this Plea Agreement. He has discussed the facts of the case with his attorney, and his attorney has explained to the defendant the essential legal elements of the criminal charges which have been brought against him. The defendant's attorney has also explained to the defendant [his] understanding of the United States' evidence.

6.     The defendant understands that the United States has the burden of proving each of the legal elements of the criminal charges beyond a reasonable doubt. The defendant and his counsel have discussed possible defenses to the charges. The defendant believes that his attorney has represented him faithfully, skillfully, and diligently, and he is completely satisfied with the legal advice of his attorney.

7.     A separate document, entitled Factual Resume, will be submitted to the Court as evidence at the guilty plea hearing. The Factual Resume is incorporated by reference into this Plea Agreement. The defendant and the United States agree that the Factual Resume is true and correct.

8.     This plea of guilty is freely and voluntarily made and is not the result of force, threats, promises, or representations apart from those set forth in this Plea Agreement. There have been no promises from anyone as to the particular sentence that the Court may impose. The defendant avers that he is pleading guilty because he knows that he is guilty.

## PENALTY

9.     The maximum penalty the Court could impose as to Count 1 of the Indictment is:

     a.     20 [years] to life imprisonment;

     b.     A fine not to exceed $8,000,000;

     c.     A term of supervised release of 10 years, which would follow any term of imprisonment. If the defendant violates the conditions of supervised release, he could be imprisoned for the entire term of supervised release; [and]

     d.     A mandatory special assessment of $100.00.

## SENTENCING

10.     The Court will impose the sentence in this case. The United States Sentencing Guidelines apply in an advisory manner to this case. The defendant has reviewed the application of the Guidelines with his attorney and understands that no one can predict with certainty what the sentencing range will be in this case until after a pre-sentence investigation has been completed and the Court has ruled on the results of that investigation. The defendant understands that at sentencing, the Court may not necessarily sentence the defendant in accordance with the Guidelines. The defendant understands that he will not be allowed to withdraw his guilty plea if the applicable guideline range is higher than expected, if the Court departs from the applicable advisory guideline range, or if the Court imposes a sentence notwithstanding the Guidelines.

11.     The United States may provide all relevant sentencing information to the Probation Office for purposes of the pre-sentence investigation. Relevant sentencing information includes, but is not limited to, all facts and circumstances of this case and information concerning the defendant's conduct and background.

12.     The defendant understands that this Plea Agreement does not create any right to be sentenced in accordance with the Sentencing Guidelines, or below or within any particular guideline range, and fully understands that determination of the sentencing range or guideline level, or the actual sentence imposed, is solely the discretion of the Court.

13.     Both the defendant and the United States are free to allocute fully at the time of sentencing.

.     .          .

## UNITED STATES' OBLIGATIONS

15.     The United States will not bring any additional charges against the defendant related to the facts underlying the Indictment and will move to dismiss the remaining counts in the Indictment as to the defendant at sentencing. This agreement is limited to the United States Attorney's Office for the Southern District of Alabama and does not bind any other federal, state, or local prosecuting authorities.

## APPLICATION OF U.S.S.G. § 5K1.1 AND/OR FED.R.CRIM.P. 35

16.     The defendant agrees to cooperate with the United States under the following terms and conditions:

.        .        .

d.      If the United States deems it necessary, the defendant may be required to take a polygraph examination[] which will be administered by a government polygrapher. The defendant agrees that the results of any polygraph examination may be used by the United States in its evaluation of whether or not there has been substantial assistance, and are admissible to rebut an assertion by the defendant of bad faith or unconstitutional motive on the part of the United States. It is also the intent of the parties that the results of any polygraph examination are admissible at the defendant's sentencing, or in the event that the defendant appears as a witness at any proceeding to testify under oath about events relating to the subject matter of the polygraph examination.

.        .        .

g.      If the defendant provides full, complete, truthful and substantial cooperation to the United States, which results in substantial assistance to the United States in the investigation or prosecution of another criminal offense, a decision specifically reserved by the United States in the exercise of its sole discretion, then the United States agrees to move for

a downward departure in accordance with Section 5K1.1 of the United States Sentencing Guidelines or Rule 35 of the Federal Rules of Criminal Procedure, whichever the United States deems applicable. The United States specifically reserves the right to make the decision relating to the extent of any such departure request made under this agreement based upon its evaluation of the nature and extent of the defendant's cooperation. The defendant understands that the United States will make no representation or promise with regard to the exact amount of reduction, if any, the United States might make in the event that it determines that the defendant has provided substantial assistance. The defendant understands that a mere interview with law enforcement authorities does not constitute substantial assistance for this purpose. The defendant also understands that should he provide untruthful information to the United States at any time, or should he fail to disclose material facts to the United States at any time, the United States will not make a motion for downward departure. If the defendant's effort to cooperate with the United States does not amount to substantial assistance as determined solely by the United States, the United States agrees to recommend to the district court judge who sentences the defendant that the defendant receive a sentence at the low end of the applicable advisory guideline range.

.        .        .

## LIMITED WAIVER OF RIGHT TO APPEAL SENTENCE

17.    The defendant acknowledges that he is aware that 18 U.S.C. § 3742 affords a defendant the right to appeal the sentence imposed. In exchange for the recommendations made by the United States in this Plea Agreement, the defendant knowingly and voluntarily waives the right to appeal any sentence imposed in this case.

18.    With the limited exceptions noted below, the defendant also waives his right to challenge any sentence so

imposed, or the manner in which it was determined, in any collateral attack, including but not limited to, a motion brought under 28 U.S.C. § 2255.

19.   The defendant reserves the right to contest in an appeal or post-conviction proceeding any of the following:

a.   Any punishment imposed in excess of the statutory maximum;

b.   Any punishment that constitutes an upward departure from the guideline range; or

c.   A claim of ineffective assistance of counsel.

20.   In addition, the defendant reserves the right to petition the Court for resentencing pursuant to 18 U.S.C. § 3582 in the event of a future retroactive amendment to the Sentencing Guidelines which would affect the defendant's sentence.

(*Id.* at 1-2, 2-4, 4-5, 7-8 & 9-10) Appearing before Ornelas' signature line on page 11 of the agreement is this paragraph: "I have consulted with my counsel and fully understand all my rights with respect to the offenses charged in the Indictment pending against me. **I have read this Plea Agreement and carefully reviewed every part of it with my attorney**. **I understand this agreement, and I voluntarily agree to it.** I hereby stipulate that the Factual Resume,[2] incorporated herein, is true and accurate in

---

[2]      The Factual Resume, which Ornelas also signed, reads, in relevant part, as follows:

The United States of America, by and through the undersigned Assistant

8

_____

United States Attorney, and the defendant, by and through his attorney of record, agree and stipulate that the Government can prove the following facts beyond a reasonable doubt:

**Elements of the offense**

**Count one**:     21 U.S.C. § 846, conspiracy to possess with intent to distribute methamphetamine ice, a Schedule II controlled substance.

There are two elements to this offense: first, that two or more individuals came to a mutual understanding to commit an unlawful act, in this case, the distribution of methamphetamine ice; and second, that the defendant, knowing of the unlawful purpose of the plan, knowingly and intentionally joined in the plan.

**Facts**

The investigation began on November 10, 2005, in Fairhope, Alabama.  Fairhope Police Officer David Hall was on routine patrol[]  when he noticed a white Buick with a white male driver stopped at an intersection.  The vehicle remained at the intersection through a couple of cycles of the traffic light, sitting there after the light turned green.  Officer Hall decided to investigate, thinking that the driver was perhaps intoxicated or having medical problems.

When the light turned green again[,] the Buick pulled off north bound so Officer Hall pulled out behind the vehicle.  Officer Hall stopped the vehicle and identified the driver as Will Matthew Clark and the passenger as Aletha Marlene Lee.

After noticing extreme nervousness on the part of the driver, Officer Hall then asked for and received consent to search the vehicle.  Officer Hall looked under the driver's seat, where he saw a multi-colored bag toward the middle of the floorboard under the seat.  When he opened it, he saw that it contained several clear bags marked with green faces that contained clear white flakes he believed to be methamphetamine "ice," electronic scales, a bag of marijuana, rolling papers, orange pills, white bar pills, a piece of foil containing black tar believed to be heroin, a bottle containing black liquid, and several other bags marked with green faces like

9

the ones which contained the methamphetamine "ice."  Under the back seat, the officer found a clear pipe with burnt residue.  Note pads with information such as phone numbers were also found and seized as evidence.  Both subjects were arrested.

In several meetings with law enforcement officers following her arrest, Lee implicated several subjects in a large methamphetamine distribution operation, including Will Clark, Earl LaPrade Miller, Jeremy Jeffcoat, Michael "Dirty Red" Blevins, Joe Walvis, Jr., Brian Albino, Steve Wasserman, Richard Nava, Gerardo Mandujano, Chris Bankster, Crystal Hood, and others.

.     .     .

Lee identified her ex-boyfriend, Miller, aka Boomie, as another participant in the distribution scheme. Miller was also getting methamphetamine from a group of Hispanics. Lee made 5 or 10 trips to Atlanta with Miller to get a quarter to a half-pound of ice. The most she ever saw Miller possess at any time was a pound during the summer of 2004. Miller took at least five or six thousand dollars to buy the drugs. She and Miller would meet Brian Albino either at a hotel or his apartment. All the trips with Miller occurred during the summer of 2004. They drove Miller's Honda Passport to Atlanta, and Miller hid the "ice" in a door panel or under the console. The drugs were wrapped in plastic.

Lee identified two of the Hispanic sources of supply who stayed with Joe Walvis, Jr., at a house in Theodore on Oaklane Drive as "Little Man," subsequently identified as Richard Nava, and Gerardo, subsequently identified as Gerardo Mandujano. The methamphetamine she had when she was arrested came from Walvis' house, and he supplied her with two ounces just prior to her arrest. Will Matthew Clark had taken her there several times to pick up methamphetamine which she would re-sell.

Lee stated that the drugs she had when she was arrested was the remainder of the "ice" she got from Walvis, who was acting as a middle man. Blevins brought Nava and Mandujano to Alabama to distribute methamphetamine "ice." Lee said that

---

Blevins made trips with the Hispanics and that on one occasion, Blevins had two pounds of "ice" on him. Blevins had written Walvis from the jail in Texas. Lee knew that Walvis had many customers who were getting methamphetamine from him, and she estimated that he was receiving two ounces of "ice" a couple of times a week. Lee believed that the Hispanics were bringing the drugs to Walvis from Texas, and that they had hidden compartments in their vehicles for this purpose. Walvis told Lee that he was paying $1,400 per ounce of "ice," and that a pound cost $10,000 at first, but had gotten more expensive over time. Walvis also told her the Hispanics were bringing him the drugs. She believed Walvis was making false identification for the Hispanics on his computer. She also believed he had their pictures on his computer at his residence. Lee knew that Walvis had surveillance cameras around his house, and that he watched monitors for suspicious activity. She said he had an office in the back of the house where most of the drug deals occurred.

On February 3, 2006, Task Force Agent Tommy Loftis was contacted by IRS Special Agent Craig Underwood relating to an investigation involving an FBI fugitive. Agent Underwood had received information from the Mobile County Sheriff's Office relating to the fugitive investigation, which linked Joe Walvis, Jr., at an address on Oaklane Drive in Theodore, to the fugitive. Agent Loftis traveled to Walvis' residence at that location, and Walvis agreed to speak with Agent Loftis after being advised of his rights. Walvis told Agent Loftis that he had been using methamphetamine for seven or eight years. He said he began to sell it about a year and a half ago, and had last used methamphetamine about three weeks ago. Walvis met Nava and Mandujano after Michael Blevins ripped them off. Blevins was currently in jail in south Texas. Walvis admitted that he began to buy methamphetamine from the Hispanics several months earlier. He first got half-pounds fronted to him, and after a few deals with them, he was $17,000 in debt to them. The Hispanics began to come to his house where they stayed until he repaid the debt. This happened about four or five times, and he sold a half-pound of ice in five days each time. He said he paid $1,400 per ounce and he sold it for $1,500 per ounce. Nava and Mandujano transported the drugs to Mobile in a 1998 or 1999 Tahoe, in a Chevrolet pickup truck, or in an

11

---

Oldsmobile with Texas plates. The Oldsmobile was still in Walvis'
backyard. Agent Loftis observed the vehicle in the yard and other
officers ran the plates. It was registered in the name of Ricardo
Nava of 4102 Magum, Apartment 54, Houston, Texas. Agent
Loftis obtained several relevant telephone numbers from Walvis'
cell phone. He then subpoenaed subscriber and toll records for the
number for Mandujano, which came back in the name of Gerardo
Mandujano, at 2 Goodson Drive, Houston, Texas. The number for
Richard Nava was a prepaid account. The telephone tolls showed
contacts among members of the conspiracy.

Walvis admitted that he had prior drug dealings with Lee,
and that he also knew that Miller had been traveling to Atlanta to
get methamphetamine from "Brian," who was subsequently
identified as Brian Albino.

.        .        .

Agent Loftis obtained arrest warrants for Walvis, Blevins,
and others on a superseding indictment returned in federal court in
February of 2006. On March 20, 2006, Agent Loftis traveled to
6461 Oaklane Drive, Theodore, Alabama, to arrest Joe Walvis, Jr.,
on the federal charges. Based on the circumstances following his
arrival at the residence, he was able to obtain a federal search
warrant for the premises and Walvis was taken into federal
custody. During the execution of the search warrant, Agent Loftis
and other agents found small amounts of cocaine, marijuana, a .45
caliber Glock handgun, and meth pipes and stems used for
ingestion of methamphetamine.

.        .        .

[O]n March 23, 2006, Walvis, through his retained counsel,
provided the agents with an interview pursuant to a proffer letter
with the Government.  Walvis provided additional information
about the Hispanic sources of supply for methamphetamine "ice."
He implicated Juan LNU, who was subsequently identified as Juan
Ornelas, as one of the suppliers in addition to Nava and
Mandujano.  Walvis told the agents that his family members told
him on the morning of March 23 that these subjects were at

12

Walvis' residence on Oaklane Drive in Theodore.  Walvis told the
agents that he owed them money for the last delivery of
methamphetamine they provided to him, but Walvis' cell phone
had been cut off, and they probably had not been able to contact
him.  Walvis said it was not unusual for them to come to Mobile to
look for him.  He also stated that they were supposed to bring
another delivery of methamphetamine "ice" with them that was
supposed to be of better quality tha[n] his last shipment from them.
Walvis admitted that he had made false identification documents
for these subjects using his computer at his residence on Oaklane
Drive.  He told the agents that they had used the Oldsmobile to
bring drugs here, and that they usually hide the drugs inside the air
conditioning duct under the dash.  He said if they used the Tahoe
or the Chevrolet pickup truck, they hid the drugs near the brake
cylinder under the hood.  Walvis said that the methamphetamine
"ice" had been wrapped in Downey sheets and salsa so that drug
dogs could not detect it.

         On April 2, 2006, Agent Loftis received information
shortly before 11:00 p.m. that Richard Nava was in Mobile looking
for Walvis, and that he would be at Walvis' residence within the
hour.  Agent Loftis contacted other law enforcement officers and
they traveled to Walvis' residence.  When they arrived at the
residence, Richard Nava and Juan Ornelas were present.  They
noticed the Chevrolet pickup truck parked at the residence.  The
agents knocked on the door, and Ornelas answered the door.  They
entered the residence to conduct a protective sweep.  They found
Richard in the bathroom shaving his head.  They secured the
residence and asked whose truck was in the yard, and Ornelas said
it was his.  They asked for and received consent to search the
vehicle, and a drug detecting dog gave a positive alert on the
driver's side under the front door. After they entered the vehicle,
the drug dog gave a positive alert under the dash area.  Agent
Loftis found indications that the fan shroud under the hood had
been removed or disturbed, and he pried it back about 4.5 inches.
Inside, he saw a black tube about 2 and [a] half feet long.  He
reached into the compartment and pulled it up.  There was a cap at
the end of the tube and another officer was able to remove the cap.
Agent Loftis could see that methamphetamine ice was inside,
wrapped in plastic.  After he removed the tube from the vehicle, he

---

removed the contents and found 12 one-ounce baggies of methamphetamine ice. A field test was conducted and the substance tested positive for methamphetamine. The vehicle was seized and Nava and Ornelas were brought to the Fairhope Police Department for questioning.

Richard Nava was advised of his rights. He signed a written waiver of his rights, and he provided a statement. Nava stated that he met Michael Blevins about two years ago and he began to discuss with Blevins the prices of methamphetamine ice. He started delivering ice from Texas to Blevins and Joe Walvis in Mobile. He said that they were coming once every two months and bringing eight ounces per load. Blevins got five ounces and Walvis got the other three. This went on for about a year, and this past year, the trips increased to one a month and they would bring five ounces per trip. Nava stated that Walvis could sell five ounces in about three hours. Nava told the agents that "Gerardo" also made some of the trips, but Nava claimed that he did not know Gerardo's last name.

Nava referred to Ornelas as "the bossman," and stated that Ornelas was obtaining the drugs in Houston. Nava denied knowledge of the source of supply for Ornelas. He and Ornelas customarily would rent a hotel room by the hour in Houston, and they would use the room to package the methamphetamine ice in the pipe. Normally, Nava inserted the pipe into the fan shroud, but Ornelas had done it occasionally. He said that Ornelas would pay him $200 per trip to Mobile. Nava told us that Ornelas bought the black PVC pipe at Home Depot with the caps.

Ornelas was advised of his rights in Spanish, and he signed a rights waiver in Spanish. He denied knowledge of the drugs in his truck. He said he had only been to Mobile twice, and the only reason he came to Mobile was to buy cars. When asked if his fingerprints would be on any of the drug evidence, he admitted that his prints would be on the packaging and on the tube. When asked about the maroon Tahoe previously identified in Walvis' statement as another vehicle used to transport drugs, Ornelas admitted that it belonged to his nephew Gerardo. Ornelas then said he did not know his nephew's last name. Ornelas said that the Tahoe would

14

every respect, and that had the matter proceeded to trial, the United States could

have proved the same beyond a reasonable doubt." (*Id.*)

        4.        On June 16, 2006, Ornelas entered a counseled guilty plea to

Count One of the Second Superseding Indictment. (*See* Doc. 691, Guilty Plea

Transcript)

> THE COURT:      . . . Mr. Ornelas, let me get you to
> raise your right hand and take an oath, please, sir.

> (The Defendant was placed under oath through the
> Interpreter.)

> THE COURT:      . . . I need to tell you that you are now
> under oath. If you answer any of my questions falsely, your

---

be at Ornelas' home address in Houston.

        The defendant admits that he is accountable for more than
1.5 kilograms of methamphetamine ice, and that the Government
can prove that amount beyond a reasonable doubt.  In Nava's post-
Miranda statement, he admitted bringing approximately 4.55
kilograms of methamphetamine ice to Mobile for distribution.

(Doc. 213, FACTUAL RESUME, at 1-2, 3-5, 8 & 10-12)

answers may later be used against you in another prosecution for perjury or for making a false statement. Do you understand that?

DEFENDANT:        Yes.

THE COURT:        Would you state your true, full name for the record, please, sir.

DEFENDANT:        Juan Ornelas.

THE COURT:        How old are you?

DEFENDANT:        45.

THE COURT:        How much education have you completed?

DEFENDANT:        Third grade.

THE COURT:        Mr. Hanley, to the best of your knowledge, is your client fully competent to enter a valid plea today?

MR. HANLEY:        Yes, sir.

THE COURT:        Mr. Ornelas, have you ever been treated for any mental illness or addiction to narcotic drugs of any kind?

DEFENDANT:        No.

THE COURT:        Are you currently under the influence of any drug or medication or alcoholic beverage of any kind?

DEFENDANT:        No. I only took some pills for diabetes.

THE COURT:        Are those pills affecting you in any

way that would prevent you from understanding what's going on here today?

DEFENDANT:     No, not exactly.

THE COURT:     Do you, in fact, understand what's going on here today?

DEFENDANT:     Yes.

THE COURT:     Have you received a copy of the indictment, had an opportunity to review it with your attorney, and do you understand the charge contained in the indictment?

DEFENDANT:     Yes.

THE COURT:     Is it necessary that I read the indictment to you?

MR. HANLEY:     We'd waive the reading of the indictment, Your Honor.

DEFENDANT:     Yes.

THE COURT:     Well, do you agree with your attorney that you are waiving the reading of the indictment?

DEFENDANT:     Yes.

THE COURT:     Are you fully satisfied with your attorney in this case, and have you fully discussed with your attorney all of the facts surrounding the charge in your case?

DEFENDANT:     Yes.

THE COURT:     [] Now, I have been furnished a written plea agreement in this case, and it appears to have your signature at the end of the plea agreement and also at the end of

17

the factual resume. Did you, in fact, sign this document?

DEFENDANT:        Yes.

THE COURT:        By signing the document, you are acknowledging that you have reviewed this document with your attorney, that you understand it, and that you agree with the information contained in it. Is that true?

DEFENDANT:        Yes.

THE COURT:        Has anyone made any promises to you or has anyone attempted in any way to force you to plead guilty or to pressure you or threaten you in any way?

DEFENDANT:        No.

THE COURT:        Now, the penalties that could be imposed if convicted of Count One of the indictment to which you are pleading guilty are outlined in the plea agreement. And if convicted of Count One, you could receive a term of imprisonment of 20 years to life, a fine not to exceed $8 million, [a] supervised release term up to ten years, and a mandatory special assessment of $100. Do you understand that?

DEFENDANT:        Yes.

THE COURT:        Is Mr. Ornelas presently on probation or parole or supervised release in any other case that would be subject to revocation if convicted in this case? Mr. Hanley, do you know? Ms. Bedwell?

MS. BEDWELL:      Your Honor, the Defendant has a prior conviction from 1999 . . . and it appears that he received a 10-year probationary sentence. There were another couple of misdemeanors, I think, that occurred after that, but we are not aware of any supervisory term of probation or parole that is subject to being revoked.

THE COURT:        Mr. Ornelas, do you know whether you are still on probation or parole in any other case at this time?

DEFENDANT:        No, sir.

THE COURT:        Okay. Will a conviction in this case, Ms. Bedwell, result in deportation, or could it result in deportation?

MR. HANLEY:        I believe it could.

THE COURT:        Mr. Ornelas, do you understand that a conviction in your case might affect your right to remain in this country?

DEFENDANT:        Yes, Your Honor.

THE COURT:        And if it did not affect your right to remain in this country and you are allowed to remain in the country, if convicted, you could lose valuable rights, including the right to vote, the right to hold public office, the right to serve on a jury, and the right to possess any kind of firearm. Because it's a drug offense, you could lose certain Federal benefits. Do you understand that?

DEFENDANT:        Yes.

THE COURT:        Ms. Bedwell, is there a forfeiture count included in the indictment?

MS. BEDWELL:        There is a forfeiture count in the indictment, and there was some cash seized. Some vehicles were also seized. The Government will notify Counsel and the Court at the time of sentencing as to any additional forfeitures that the Government is seeking at that time.

THE COURT:        Mr. Ornelas, if you plead guilty, the

Court could require you to forfeit certain property to the United States. Do you understand that?

DEFENDANT:        Yes.

THE COURT:        . . . The United States Sentencing Commission has issued guidelines for judges to consider in determining the sentence in a criminal case. Have you and your attorney talked about how those guidelines might affect your case?

DEFENDANT:        Yes.

THE COURT:        The way in which the Sentencing Guidelines apply to your case might be affected by what you say to the Court and to the probation officer. The Court will not be able to determine an appropriate sentence for your case until after a presentence report has been completed and you and the United States have had an opportunity to challenge the facts reported by the probation officer.

Do you understand that?

DEFENDANT:        Yes.

THE COURT:        The sentence imposed might be different from any estimate your attorney or anyone else might have given you. Do you understand that?

DEFENDANT:        Yes.

THE COURT:        After it has been determined what guideline applies to a case, the judge has the authority to impose a sentence that is more severe or less severe than the sentence called for in the guidelines.

Do you understand that?

20

DEFENDANT:          Yes.

THE COURT:          Under some circumstances, you and the United States each may have the right to appeal any sentence the judge imposes. For instance, you can appeal your conviction if you believe that your guilty plea was somehow unlawful or involuntary or if there's some other fundamental defect in the proceedings not waived by your guilty plea.

You also have a statutory right to appeal your sentence under certain circumstances, particularly if you think the sentence is contrary to law. With few exceptions, any notice of appeal must be filed within ten days of judgment being entered in your case.

If you are unable to pay the cost of an appeal, you may apply for leave to appeal in forma pauperis.

Do you understand that?

DEFENDANT:          Yes.

THE COURT:          You also have the right to waive your right to appeal. And I see by your plea agreement that you are waiving your right to appeal any sentence imposed with the following exceptions: And that would be any punishment in excess of the statutory maximum, any punishment constituting an upward departure of the guideline range, and any claim of ineffective assistance of counsel. Do you understand that?

DEFENDANT:          Yes.

THE COURT:          Parole has been abolished. If you are sentenced to prison, you will not be released on parole. Do you understand that?

DEFENDANT:          Yes.

THE COURT:        If the sentence is more severe than you expected or if I do not accept the sentencing recommendation in your plea agreement, you will still be bound by your plea. Even if you do not like the sentence imposed by the Court, you will not be able to withdraw your plea. The time to make that decision is now. Do you understand that?

DEFENDANT:        Yes.

THE COURT:        You have the right to plead not guilty to any offense charged against you and to persist in that plea. You would then have the right to a trial by jury. During that trial, you would have the right to the assistance of counsel for your defense and to the appointment of counsel if you could not afford to hire one, the right to see and hear all of the witnesses and have your attorney cross-examine them, the right to testify yourself or to decline to testify and remain silent, and the right to have the Court issue subpoenas for any witnesses you wish to call in your defense.

At the trial, you would be presumed to be innocent, and the United States would have the burden of proving that you are guilty beyond a reasonable doubt. Before you can be convicted, all 12 jurors must be convinced that the United States has met that burden.

If you are found guilty after a trial, you would then have the right to appeal that conviction to a higher court, and if you could not afford to pay the cost of an appeal, the Government would pay those costs for you.

Do you understand that?

DEFENDANT:        Yes.

THE COURT:        If you plead guilty, however, and if the Court accepts your plea, there will be no trial; you will be waiving or giving up your right to a trial and all the other rights

22

that I just described. Do you understand that?

DEFENDANT:        Yes.

THE COURT:       Also contained in your plea agreement is a factual resume, and the factual resume has a statement of the elements of the offense to which you are pleading guilty. And that offense is charged in Count One of the indictment, stating a violation of 21, United States Code, Section 846, which is conspiracy to possess with intent to distribute methamphetamine ice.

The elements of that offense are that two or more individuals came to a mutual understanding to commit an unlawful act, in this case, the distribution of methamphetamine ice; and that you, knowing of the unlawful purpose of the plan, knowingly and intentionally joined in the plan.

Do you understand that those are the elements of the offense to which you are pleading guilty?

DEFENDANT:        Yes.

THE COURT:        And do you fully understand that if there was a trial in this case, the United States would be required to present sufficient evidence to prove each of these essential elements beyond a reasonable doubt?

DEFENDANT:        Yes.

THE COURT:        Also included in your factual resume is a statement of facts. And you have already told me that you have discussed these facts with your attorney, that you understand them, and that you agree with them. Is that true?

DEFENDANT:        Yes.

THE COURT:        Did you, in fact, commit the acts and

23

do the things that you have admitted to in this factual resume?

DEFENDANT:      Yes.

THE COURT:      Then I find that the facts and acts to which you have admitted support a violation of the charge contained in Count One of the indictment. How do you now plead to the charge in Count One of the indictment, guilty or not guilty?

DEFENDANT:      Guilty.

THE COURT:      And are you pleading guilty of your own free will because you are guilty?

DEFENDANT:      I am guilty.

THE COURT:      Mr. Hanley, are you aware of any reason the Court should not accept Mr. Ornelas' guilty plea at this time?

MR. HANLEY:      No, Your Honor.

THE COURT:      Then it is the finding of this Court in the case of the United States versus Juan Ornelas that you are fully competent and capable of entering an informed plea, that you are aware of the nature of the charge and the consequences of your plea, and that your plea of guilty is a knowing and voluntary plea supported by an independent basis in fact containing each of the essential elements of the offense. Your plea is therefore accepted, and you are now adjudged guilty of that offense.

(*Id*. at 2-12)

5.      In open court on June 6, 2006, the government filed an Information charging a prior felony conviction. (Doc. 214) "Comes now the

United States and files its Information charging a prior felony conviction for an offense involving delivery of marijuana, a Schedule I controlled substance, in state court in Texas, on or about August 9, 1999, for which the defendant originally received a sentence of 6 years, and 10 years of probation, so that the penalties for second and subsequent offense described in Title 21, United States Code, Section 841(b)(1)(A), (B) and (C) apply, in accordance with Title 21, United States Code, Section 851." (*Id*.)

6.      The Presentence Investigation Report was initially prepared by the Probation Office on August 21, 2006 and provided to counsel. (*See* Doc. 326, at 1) Therein, Ornelas and his attorney were notified that his offense level was being increased by two levels due to his possession of a firearm during commission of the offense and an additional four levels due to him being "an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive[.]" (*Id*. at 17, ¶¶ 63 & 65) Ornelas' attorney specifically objected to these paragraphs of the report. (Doc. 314)

     1.      The Defendant objects to the finding that a weapon was used in the furtherance of the conspiracy which was reasonably foreseeable to the Defendant as stated in paragraph sixty-three in the pre-sentence investigation report.

     2.      The Defendant objects to the finding that he was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive as stated in

25

paragraph sixty-five of the pre-sentence investigation report.

(*Id.*)  The probation officer added an addendum to her report on September 19,

2006, and addressed the defendant's objections, as follows:

> [Paragraph 63]        Investigating agents also recovered
> numerous firearms, from various defendants, during the time
> period of **Ornelas'** involvement in the conspiracy. In accordance
> with U.S.S.G. § 2D1.1(b)(1), as well as 11th Circuit case law, if
> a dangerous weapon (including a firearm) was possessed by a
> codefendant, during the same time that the defendant was a
> member of the conspiracy[,] that the weapon was used in
> furtherance of the conspiracy[,] and possession of the firearm
> was reasonably foreseeable to the defendant, the offense level is
> increased by two levels. The probation officer respectfully
> recommends that both parties be prepared to present their
> positions in regards to this matter, at sentencing.

> .        .        .

> [Paragraph 65]        Investigative information reveals that
> the defendant was the "boss" of the conspiracy; that he directed
> the actions of Richard Nava; and that the conspiracy involved
> five or more participants, and was otherwise extensive. The
> probation officer respectfully recommends that both parties be
> prepared to present their positions in regards to this matter, at
> sentencing.

(Doc. 326, ADDENDUM TO THE PRESENTENCE REPORT, at 1 & 2

(emphasis in original)) Based upon a total offense level of 41 and all other

factors contained in the report, including a criminal history category of III, the

probation officer recommended that Ornelas receive a 360-month term of

imprisonment,[3] a 10-year term of supervised release following his release from prison, and a special assessment of $100.00. (*Id.*, SENTENCING RECOMMENDATION, at 1-3)

       7.     Because the parties could not agree on the total offense level, testimony was taken at the June 11, 2008 sentencing hearing. (Doc. 691, Sentencing Hearing Transcript, at 5-36) Joe Walvis, Jr. testified that starting in September of 2004 he purchased methamphetamine from Ornelas and that everyone, specifically Richard Nava and Gerardo Mandujano, referred to Ornelas as "the bossman." (*Id.* at 5-6)[4] In addition, Walvis testified that he possessed firearms during the course of his participation in the distribution of methamphetamine and that he provided guns to Gerardo Mandujano, in the presence of Ornelas, during this time. (*Id.* at 7-8) Walvis testified that he carried a gun with him when he distributed methamphetamine or collected money and that on the one or two occasions each month Ornelas would bring him methamphetamine from Texas, the defendant saw him in possession of

---

[3]     According to the PSI, the guidelines produced a range of 360 months to life imprisonment. (*See* Doc. 326, SENTENCING RECOMMENDATION, at 1)

[4]     Gerardo Mandujano testified that he sold drugs for Ornelas and for each trip to Mobile from Houston he would receive either $800 or $1,000 from the defendant. (*Id.* at 27-28) Mandujano also testified that he believed Ornelas paid Richard Nava to transport methamphetamine from Houston to Mobile. (*Id.* at 36)

weapons. (*Id*. at 8-9)[5] Following this testimony, and considering the arguments

of counsel (*see id*. at 37-39), the Court made the following determinations:

> THE COURT:        . . . Ms. Bedwell, I note in your last argument to me with regard to the aggravating role under the Guidelines you used the terms "manage" and "supervise", and it strikes me that the testimony that has been proffered today by Mr. Walvis and Mr. Mandujano, whose testimony I do credit based on my observation of them and hearing their testimony in relation to each other, as well as other evidence that's been presented in sentencing hearings of the co-defendants in this case.

> And I guess what I'm saying is it strikes me that Mr. Ornelas occupied a managerial or supervisory role as opposed to an organizer or leadership role. And I think that's more appropriate under the circumstances. Rather than a 3B1.1(a) aggravating role, Subsection (b) is more appropriate given the testimony in this case.

> MS. BEDWELL:     Yes, sir. We agree with the Court on that issue. At the time that the Presentence Investigation was prepared, Valentin Martinez had not been arrested. And since then, we've obtained additional information about Valentin Martinez, whom we believe is probably at the top of the heap in terms of the people that we identified and prosecuted here. So, we have no objection to the Court's finding with regard to the three-level enhancement.

> THE COURT:       All right. And I think that's appropriate under the circumstances.

> With regard to the Defendant's objection, the objection is

---

[5]        Walvis reiterated on cross-examination that he carried a gun on his person twenty-four hours a day during the entire time he was associated with Ornelas. (*See id*. at 21) Walvis never saw Ornelas or Nava in possession of any weapons. (*See id*.)

overruled and the Court will apply the three-level enhancement as opposed to the four-level enhancement based on the evidence presented here today.

With regard to the firearm, I credit Mr. Walvis' testimony, having observed his demeanor in this court, and find that based on that testimony it was reasonably foreseeable to Mr. Ornelas that other co-defendants in this case possessed firearms, not only reasonably foreseeable, but if I credit Mr. Walvis' testimony, Mr. Ornelas was present in the house where there were guns, he saw guns, he saw the transfer of guns . . . between co-defendants and, therefore, was aware that guns were being used in this drug conspiracy. Therefore, the two-level enhancement applied under the Guidelines is appropriate and the objection is overruled.

(*Id.* at 39-41)

8.     After these determinations were made by the Court and the parties

engaged in a discussion regarding why the government had failed to make a

motion for downward departure (*see id*. at 41-45),[6] the following occurred:

THE COURT:          Well, let's make sure we get this right now. We're talking about the Guidelines, and the base offense level, as I see it, is 38. There's a two-level enhancement for possession of the firearm. There's a three-level enhancement for supervisor or managerial role. That's a 43. He gets a three-level reduction for acceptance of responsibility, producing an adjusted offense level of 40. Mr. Ornelas has four criminal history points, placing him in Criminal History Category III. And as I see that, it's still 360 to life, or do you have a different table than I do? .

---

[6]     Ornelas failed the polygraph examination he was administered with respect to two questions posed to him. (*See id.*) The parties specifically agreed in the plea agreement that the results of any polygraph examination administered by the government could be used "by the United States in its evaluation" of whether or not there had been substantial assistance. (Doc. 213, ¶ 16.d.)

. .

PROBATION OFFICER TERRY FREIBERT:   W e l l , Your Honor, based on my understanding, this was a mixture and substance rather than ice.

THE COURT:        Okay. Maybe we do need to make that adjustment then. Ms. Bedwell, is this a mixture and substance as opposed to an ice case?

MS. BEDWELL:    Yes, sir. . . . I was under the impression that had already been done with regard to this Defendant.

THE COURT:        No, it has not. So, it starts at a 36 then?

PROBATION OFFICER TERRY FREIBERT:   Yes, Your Honor.

THE COURT:        Okay. Well, that does make some adjustment difference. The base offense level is 36; therefore, the adjusted level offense is 38, and the range is now 292 to 365 months.

Mr. Hanley, I assume that [] doesn't affect your argument. . . . [Y]our argument is that a sentence of 240 months is reasonable under the circumstances . . . regardless of what the Guidelines say here?

MR. HANLEY:       Yes, sir.

THE COURT:        And Ms. Bedwell . . . I guess . . . the recommendation would be then for a low-end guideline sentence?

MS. BEDWELL:      Yes, sir. I suppose that's appropriate

30

even in light of the shift in the Guidelines. We've had several of these cases, and I was under the impression that this one had been corrected in the Presentence, but apparently that's not correct. . . . Even though we believe the Defendant is in breach of the plea agreement, I still can live with the low-end sentence of 292 months as reasonable under the circumstances.

THE COURT:       All right. I think I have made the guideline corrections for the record. Anything further from the Government at this time?

MS. BEDWELL:     No, sir.

THE COURT:       Mr. Hanley?

MR. HANLEY:      No, sir.

THE COURT:       All right. Mr. Ornelas, the Court has considered all of the information that it has available to it through the Presentence Report. I've had testimony about the facts and circumstances of this case in a number of hearings, so I'm familiar with the facts that are spelled out in the Presentence Report.

I know this to be an extensive methamphetamine conspiracy. There was a large quantity, a substantial quantity of methamphetamine brought into the Southern District of Alabama from Texas and perhaps from Mexico. I know . . . of your involvement in that conspiracy. I've determined that you occupied a position as a manager or supervisor, and there's no question in my mind that your part in this conspiracy is substantial.

You have come before the Court, you have pled guilty, you've accepted responsibility for your actions, and you've been given credit under the guideline for that.

The Government has explained why they are not moving

31

for a further departure based on your cooperation, and I will accept their explanation for and justification for a failure to file a 5K1 motion in this case.

Having considered all of the factors, having considered the requirements under Section 3553(a) of Title 18, it is the judgment of this Court that a guideline sentence is appropriate and reasonable under all of the circumstances and that a sentence at the low end of the Guidelines will accomplish the sentencing objectives of Section 3553(a).

Accordingly, pursuant to the Sentencing Reform Act of 1984, it is the judgment of this Court that you, Juan Ornelas, are hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a term of 292 months as to Count One. Upon release from imprisonment, you shall be placed on supervised release for a term of 10 years.

Immediately after incarceration and as a special condition of supervised release, you are to be delivered to a duly authorized immigration official for deportation. If deported, you are to remain outside the United States pursuant to Federal law. If not deported, within 72 hours of release from the custody of the Bureau of Prisons or immigration authorities, you are to report in person to the probation office in the district to which you are released.

While on supervised release, you shall not commit any Federal, state, or local crimes, you shall be prohibited from possessing a firearm or other dangerous device, and shall not possess a controlled substance. In addition, you shall comply with the standard conditions of supervised release as recommended by the  Sentencing Commission and on record with this Court.

It is ordered that you also comply with the following special condition of supervised release; that is, that you shall participate in a program of testing and treatment for drug and/or

alcohol abuse as directed by the Probation Office.

The Court finds that you do not have the ability to pay a fine; therefore, no fine is imposed.

For the reasons given, the Court finds that the sentence imposed addresses the seriousness of the offense and the sentencing objectives of punishment, deterrence, and incapacitation.

It is ordered that you pay a special assessment in the amount of $100 on Count One, which is due immediately.

You can appeal your conviction if you believe that your guilty plea was somehow unlawful or involuntary of if there's some defect in the proceedings not waived by your guilty plea or your plea agreement.

You have the right to apply for leave to appeal in forma pauperis, and the Clerk of Court will prepare and file notice of appeal upon your request. With few exceptions, any notice of appeal must be filed within 10 days of the date of judgment.

I note that there are remaining counts of the indictment, Count 11 and Count 12, which is a forfeiture count. Ms. Bedwell, do you have a motion with regard to those counts?

MS. BEDWELL:   Yes, sir. We move the Court to dismiss the remaining counts as to this Defendant at this time. We have not identified any specific assets with regard to the forfeiture count as well.

THE COURT:     All right. Counts 11 and 12 are hereby dismissed on the Government's motion. Anything further from the Government at this time?

MS. BEDWELL:   No, sir.

.　　　.　　　.

THE COURT:        And Mr. Hamley?

MR. HANLEY:       No, sir.

(*Id.* at 45-51)

9.       On June 23, 2008, Ornelas, through counsel, filed a motion to appeal *in forma pauperis* (Doc. 664) and four days later written notice of appeal (Doc. 665). Judgment was entered on June 27, 2008. (Doc. 672) The Eleventh Circuit Court of Appeals affirmed Ornelas' conviction and sentence on February 18, 2009. (Doc. 709)

> Kristen Rogers, appointed counsel for Juan Ornelas in this direct criminal appeal, has moved to withdraw from further representation of the appellant and filed a brief pursuant to Anders v. California, 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967). Because independent examination of the entire record reveals no arguable issues of merit, counsel's motion to withdraw is **GRANTED**, and Ornelas's conviction and sentence are **AFFIRMED**.

(*Id.*)

10.       On September 9, 2009, Ornelas filed the present collateral attack on his conviction and sentence pursuant to 28 U.S.C. § 2255. (Doc. 720, at 12 (date petition was placed in the prison mailing system); *see also* Doc. 721 (memorandum)) Considering these two pleadings together, the undersigned finds that  petitioner raises the following grounds which he claims entitle him

34

to relief: (1) ineffective assistance of counsel due to trial counsel's failure "to advocate, object to the government's improper plea agreement, as well as the erroneous use of the improper enhancement of Petitioner's sentence by conduct of which he was not charged with, the improper cross-reference [s]ection[] in relation to his sentence, as well as the use of an improper criminal history score and a complete failure to advocate for his client[]" (Doc. 721, at 13-14; *see also* Doc. 720, at 4-5 ("It is Petitioner's assertion that counsel failed to provide a level of assistance guaranteed by the Sixth Amendment, Counsel failed to advocate for Petitioner as client, counsel allowed the Gov. to bully petitioner into accepting a plea agreement that is and was skewed to benefit only the government, and gave the government total advantage at sentencing and later, in any collateral proceedings, including Direct Appeal.");[7] and (2) numerous sentencing issues, including that the court's two-level firearm enhancement and three-level managerial/supervisory-role enhancement were improper,[8] his sentence is not reasonable in light of § 3553(a) factors, the government failed to properly make a motion for downward departure, and he was sentenced

---

[7]    Petitioner also appears to contend that appellate counsel was ineffective in filing an *Anders* brief on appeal.

[8]    In this regard, petitioner also contends that these enhancements were made based on uncharged conduct resulting in a *Booker* violation.

35

without a determination being made with respect to whether the drug involved was D-Methamphetamine or L-Methamphetamine. (*Compare* Doc. 720, at 6-8 *with* Doc. 721)

11.     The United States filed its response in opposition on October 8, 2009. (Doc. 724) Therein, the government argues that petitioner's ineffective assistance of counsel claims, as they relate to his guilty plea proceeding and direct appeal, have no merit and that all other claims raised by petitioner are essentially sentencing claims which are due to be dismissed given the valid sentence-appeal waiver in this case. (*See id.* at 2-9) Ornelas was instructed by order entered on October 1, 2009 to file his reply brief not later than December 14, 2009. (*See* Doc. 722)  To date, this Court has not received a reply from the petitioner.

## CONCLUSIONS OF LAW

1.     28 U.S.C. § 2255 reads, in relevant part, as follows: "A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack,

may move the court which imposed the sentence to vacate, set aside or correct the sentence."

2.      In this circuit, "[a]n appeal waiver is valid if a defendant enters into it knowingly and voluntarily." *United States v. Bascomb*, 451 F.3d 1292, 1294 (11th Cir. 2006) (citation omitted); *see also United States v. Bushert*, 997 F.2d 1343, 1350 (11th Cir. 1993) ("We hold, therefore, that in most circumstances a defendant's knowing and voluntary waiver of the right to appeal his sentence will be enforced by this circuit."), *cert. denied,* 513 U.S. 1051, 115 S.Ct. 652, 130 L.Ed.2d 556 (1994).  In this case, Ornelas pleaded guilty during a change of plea proceeding after being informed of the limited appeal waiver and acknowledging his understanding of that limited waiver. Specifically, Ornelas informed the Court that he understood, as set forth in the plea agreement bearing his signature, that he had waived all rights to appeal his sentence except that he could appeal if the punishment imposed was in excess of the statutory maximum, if the punishment imposed constituted an upward departure from the guideline range, or if he had a claim of ineffective assistance of counsel. (Doc. 691, Guilty Plea Hearing, at 9; *compare id. with* Doc. 213, PLEA AGREEMENT, at ¶¶ 17-19) On direct appeal, not only did appellate

counsel review the record and conclude in her *Anders*[9] brief that none of the three permissible appealable issues set forth in the appeal waiver portion of the guilty plea were present (*see* Doc. 721, at 31) but, as well, the Eleventh Circuit, in affirming Ornelas' conviction and sentence, conducted an "independent examination of the entire record" and found "no arguable issues of merit[.]" (Doc. 709) Based upon the foregoing, the undersigned holds that Ornelas' knowing and voluntary limited waiver of his right to appeal his sentence in this case should be enforced. Because it is clear that Ornelas' punishment was not in excess of the statutory maximum nor was his sentence an upward departure from the guideline range, his numerous sentencing arguments cannot be challenged in this collateral petition. *Cf. Bushert, supra,* 997 F.2d at 1350 n.17 (indicating that even broad waivers, which include a waiver of collateral appeal of the sentence, can be judicially enforced so long as they are knowing and voluntary).[10]

---

[9]      *Anders v. California*, 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967).

[10]      Moreover, in light of this conclusion, petitioner is precluded from contesting his counsel's effectiveness related to his sentencing. *Williams v. United States*, 396 F.3d 1340, 1342 (11th Cir.) ("While we have not addressed whether a sentence-appeal waiver includes the waiver of the right to challenge the sentence collaterally in the context of a § 2255 petition asserting ineffective assistance of counsel, every Circuit to have addressed the issue has held that a valid sentence-appeal waiver, entered into voluntarily and knowingly, pursuant to a plea agreement, precludes the defendant from attempting to attack, in a collateral proceeding, the sentence through a claim of ineffective assistance of counsel during sentencing. We are persuaded by the foregoing consistent line of authority from our sister Circuits on this issue, particularly since a

3.      Ornelas also contends, in part, that constitutionally ineffective assistance of counsel entitles him to the relief afforded by 28 U.S.C. § 2255.[11] In order to establish a claim of ineffective assistance of counsel, a petitioner is required to show (1) that his attorney's representation fell below "an objective standard of reasonableness" and (2) that a reasonable probability exists that but for counsel's unprofessional conduct, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). "The petitioner bears the burden of proof on the 'performance' prong as well as the 'prejudice' prong of a *Strickland* claim, and

_____

contrary result would permit a defendant to circumvent the terms of the sentence-appeal waiver simply by recasting a challenge to his sentence as a claim of ineffective assistance, thus rendering the waiver meaningless." (internal citations omitted)), *cert denied*, 546 U.S. 902, 126 S.Ct. 246, 163 L.Ed.2d 226 (2005). In other words, Ornelas cannot now attack in this § 2255 two-level gun enhancement to his sentence, the three-level enhancement to his sentence due to his managerial/supervisory role in the conspiracy, the alleged "D"-methamphetamine sentencing versus "L"-methamphetamine sentencing, etc., based upon the claim that his attorney was ineffective in failing to properly object to those enhancements. These claims of ineffective assistance of counsel are precluded by Ornelas' valid sentence-appeal waiver.

[11]      Once a criminal defendant enters a guilty plea, he waives all non-jurisdictional challenges to the conviction's constitutionality and only an attack on the voluntary and knowing nature of the plea can be raised.  *See McMann v. Richardson*, 397 U.S. 759, 772, 90 S.Ct. 1441, 1449, 25 L.Ed.2d 763 (1970).  Stated differently, "a voluntary and intelligent plea made by an accused person, who has been advised by ***competent counsel***, may not be collaterally attacked." *Mabry v. Johnson*, 467 U.S. 504, 508, 104 S.Ct. 2543, 2546-2547, 81 L.Ed.2d 437 (1984) (emphasis supplied). Therefore, when a § 2255 motion is filed collaterally challenging convictions obtained pursuant to guilty pleas, "the inquiry is ordinarily confined to whether the underlying plea was both counseled and voluntary." *United States v. Broce*, 488 U.S. 563, 569, 109 S.Ct. 757, 762, 102 L.Ed.2d 927 (1989).

both prongs must be proved to prevail." *Johnson v. Alabama*, 256 F.3d 1156,

1176 (11th Cir. 2001), *cert. denied sub nom. Johnson v. Nagle*, 535 U.S. 926,

122 S.Ct. 1295, 152 L.Ed.2d 208 (2002).[12] The *Strickland v. Washington*

standard for evaluating claims of ineffective assistance of counsel was held

applicable to guilty pleas in *Hill v. Lockhart*, 474 U.S. 52, 58, 106 S.Ct. 366,

370, 88 L.Ed.2d 203 (1985).

> To succeed on such a claim, "the defendant must show that
> counsel's performance was deficient. This requires showing that
> counsel made errors so serious that counsel was not functioning
> as the 'counsel' guaranteed the defendant by the Sixth
> Amendment." *Strickland v. Washington*, 466 U.S. 668, 687, 104
> S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984).[13] In addition, the
> defendant must establish that "counsel's constitutionally
> ineffective performance affected the outcome of the plea
> process." *Hill*, 474 U.S. at 59, 106 S.Ct. at 370. In other words,
> . . . [a petitioner] "must show that there is a reasonable
> probability that, but for counsel's errors, he would . . . have
> pleaded [not] guilty and would . . . have insisted on going to
> trial." *Hill*, 474 U.S. at 59, 106 S.Ct. at 370.

*Coulter v. Herring*, 60 F.3d 1499, 1504 (11th Cir. 1995) (footnote, brackets and

ellipses added), *cert. denied sub nom. Coulter v. Jones*, 516 U.S. 1122, 116

---

[12]     It is proper in considering claims made by a federal prisoner under § 2255 to look
for guidance from cases discussing claims raised by state prisoners under 28 U.S.C. § 2254. *See
Hagins v. United States,* 267 F.3d 1202, 1205 (11th Cir. 2001) (citing *Holladay v. Haley*, 209
F.3d 1243 (11th Cir. 2000)), *cert. denied*, 537 U.S. 1022, 123 S.Ct. 545, 154 L.Ed.2d 432
(2002).

[13]     "When analyzing ineffective-assistance claims, reviewing courts must indulge a
strong presumption that counsel's conduct fell within the wide range of reasonably professional
assistance." *Smith v. Singletary*, 170 F.3d 1051, 1053 (11th Cir. 1999) (citations omitted).

S.Ct. 934, 133 L.Ed.2d 860 (1996).[14]

4.     When applying the *Strickland* standard, it is clear that courts "are free to dispose of ineffectiveness claims on either of its two grounds."  *Oats v. Singletary*, 141 F.3d 1018, 1023 (11th Cir. 1998) (citation omitted), *cert. denied sub nom. Oats v. Moore*, 527 U.S. 1008, 119 S.Ct. 2347, 144 L.Ed.2d 243 (1999); *see also Butcher v. United States*, 368 F.3d 1290, 1293 (11th Cir. 2004) ("[O]nce a court decides that one of the requisite showings has not been made it need not decide whether the other one has been.").

5.     Petitioner's conclusory and confusing allegations of ineffective assistance of counsel do not entitle him to relief.  As previously indicated, petitioner contends that his trial "Counsel failed to advocate for Petitioner as client, counsel allowed the Gov. to bully petitioner into accepting a plea agreement that is and was skewed to benefit only the government, and gave the government total advantage at sentencing and later, in any collateral proceedings, including Direct Appeal." (Doc. 720, at 4-5; *see also* Doc. 721, at 13-14 ("[C]ounsel failed to advocate [and] object to the government's improper plea agreement[.]")) Even accepting these unsupported allegations as true and

---

[14]     "'[T]he cases in which habeas petitioners can properly prevail on the ground of ineffective assistance of counsel are few and far between.'" *Johnson, supra,* 256 F.3d at 1176 (citation omitted).

finding trial counsel deficient, Ornelas has not and cannot establish that but for

these deficiencies he would have pleaded not guilty and would have insisted on

going to trial. This lack of prejudice is established by petitioner's very own

brief filed in support of his § 2255 motion, Ornelas asserting therein as his sole

request for relief re-sentencing. (*Compare* Doc. 721, at 28-29 ("Petitioner

asserts that for the [] foregoing reasons, and but counsel's ineffective

assistance, his sentence should be vacated and remanded for re[-]sentencing

despite the presence of the plea agreement.") *with id.* at 37 ("Petitioner prays

that this honorable court review i[t]s previous ruling, consider Petitioner's

reasoning and rational[e], and grant him the relief he request[s] in the form of

the vacation of his sentence, and a re-sentencing, where Petitioner's sentence

is unreasonable and is outside of the statutory guideline."))[15] Ornelas' inability

to establish prejudice sounds the death knell for his ineffective assistance of

---

[15]       Given the focus of petitioner's request for relief, the undersigned finds Ornelas'
conclusory allegations that his "[c]onviction was obtained by plea of guilty which was
unlawfully induced and which was made involuntary, and without clear understanding of the
nature of the charges[] and the consequences of a plea" (*see, e.g.,* Doc. 720, at 5), to be wholly
without support in the record. Ornelas benefitted by pleading guilty inasmuch as he was
sentenced at the low-end of the sentencing guidelines (292 months) rather than facing the
statutory maximum of life sentence upon conviction following a jury trial on the conspiracy
count alone. It is clear from the sentencing transcript that the government had co-conspirators
ready and willing to testify about Ornelas' involvement in the conspiracy to distribute
methamphetamine had he chosen to go to trial; therefore, petitioner and his attorney made the
correct call to enter a guilty plea and benefit from the acceptance of responsibility.

trial counsel claims[16] as they relate to the guilty plea proceeding.[17]

6.     In consideration of the foregoing, the Magistrate Judge recommends that the Court deny Ornelas' motion to vacate, set aside or correct his sentence under 28 U.S.C. § 2255.

7.     Pursuant to Rule 11(a) of the Rules Governing § 2255 Proceedings, the undersigned recommends that a certificate of appealability in this case be denied. 28 U.S.C. foll. § 2255, Rule 11(a) ("The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."). The habeas corpus statute makes clear that an applicant is entitled to appeal a district court's denial of his habeas corpus petition only where a circuit justice or judge issues a certificate of appealability. 28 U.S.C. § 2253(c)(1). A certificate of appealability may issue only where "the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Where, as here, a habeas petition is being denied, in

---

[16]     The undersigned also finds that petitioner has not articulated how he was prejudiced by appellate counsel's act of filing an *Anders* brief in light of the Eleventh Circuit's statement that it had independently examined the record and found no arguable issue of merit. Accordingly, petitioner's assertion of ineffective assistance of appellate counsel also need fail.

[17]     Ornelas is not entitled to an evidentiary hearing in this case in light of his wholly conclusory allegations. *Tejada v. Dugger*, 941 F.2d 1551, 1559 (11th Cir. 1991) ("A petitioner is *not* entitled to an evidentiary hearing . . . 'when his claims are merely "conclusory allegations unsupported by specifics" or "contentions that in the face of the record are wholly incredible."'"), *cert. denied sub nom. Tejada v. Singletary*, 502 U.S. 1105, 112 S.Ct. 1199, 117 L.Ed.2d 439 (1992).

substantial part, on procedural grounds without reaching the merits of an underlying constitutional claim, "a COA should issue [only] when the prisoner shows . . . that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling[,]" *Slack v. McDaniel*, 529 U.S. 473, 484, 120 S.Ct. 1595, 1604, 146 L.Ed.2d 542 (2000), and, in part, on the merits of an underlying constitutional claim, a COA should issue only when the petitioner demonstrates "that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong[,]" *id.*; *see also id.* at 483-484, 120 S.Ct. at 1603-1604 ("To obtain a COA under § 2253(c), a habeas prisoner must make a substantial showing of the denial of a constitutional right, a demonstration that, under *Barefoot*, includes showing that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were "'adequate to deserve encouragement to proceed further.'""); *see Miller-El v. Cockrell,* 537 U.S. 322, 336, 123 S.Ct. 1029, 1039, 154 L.Ed.2d 931 (2003) ("Under the controlling standard, a petitioner must 'sho[w] that reasonable jurists could debate whether  (or, for that matter, agree that) the petition should have been

resolved in a different manner or that the issues presented were "adequate to deserve encouragement to proceed further.""'"). The sentence-appeal waiver in this case is valid and, therefore, a reasonable jurist could not conclude that this Court is in error for failing to reach the merits of petitioner's sentencing issues, *see Bushert, supra,* or that it is in error in failing to reach Ornelas' ineffective-assistance-of-counsel claims as they relate to those sentencing issues, *see Williams, supra,* nor could a reasonable jurist conclude that petitioner should be allowed to proceed further with respect to these claims. *Slack, supra*, 529 U.S. at 484, 120 S.Ct. at 1604 ("Where a plain procedural bar is present and the district court is correct to invoke it to dispose of the case, a reasonable jurist could not conclude either that the district court erred in dismissing the petition or that the petitioner should be allowed to proceed further."). In addition, as it relates to petitioner's other assertions of ineffective assistance of trial and appellate counsel, reasonable jurists could not debate whether Ornelas' § 2255 motion to vacate should be resolved in a different manner or that the Sixth Amendment issues presented are adequate to deserve encouragement to proceed further. Accordingly, petitioner is not entitled to a certificate of appealability.

## **CONCLUSION**

The Magistrate Judge is of the opinion that petitioner's rights were not

violated in this cause and that his request to vacate, set aside or correct his sentence should be **DENIED**. Petitioner is not entitled to a certificate of appealability and, therefore, he is not entitled to appeal *in forma pauperis*.

The instructions which follow the undersigned's signature contain important information regarding objections to the report and recommendation of the Magistrate Judge.

**DONE** this the 24th day of March, 2010.

  s/WILLIAM E. CASSADY
**UNITED STATES MAGISTRATE JUDGE**

**MAGISTRATE JUDGE'S EXPLANATION OF PROCEDURAL RIGHTS AND
RESPONSIBILITIES FOLLOWING RECOMMENDATION, AND
<u>FINDINGS CONCERNING NEED FOR TRANSCRIPT</u>**

l.      *Objection*.  Any party who objects to this recommendation or anything in it must, within fourteen (14) days of the date of service of this document, file specific written objections with the Clerk of this court.  Failure to  do so will bar a *de novo* determination by the district judge of anything in the recommendation and will bar an attack, on appeal, of the factual findings of the Magistrate Judge.  *See* 28 U.S.C. § 636(b)(1)(C); *Lewis v. Smith*, 855 F.2d 736, 738 (11th Cir. 1988); *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. Unit B, 1982)(*en banc*).  The procedure for challenging the findings and recommendations of the Magistrate Judge is set out in more detail in SD ALA LR 72.4 (June 1, 1997), which provides that:

> A party may object to a recommendation entered by a magistrate judge in a dispositive matter, that is, a matter excepted by 28 U.S.C. § 636(b)(1)(A), by filing a 'Statement of Objection to Magistrate Judge's Recommendation' within ten days[18] after being served with a copy of the recommendation, unless a different time is established by order.  The statement of objection shall specify those portions of the recommendation to which objection is made and the basis for the objection.  The objecting party shall submit to the district judge, at the time of filing the objection, a brief setting forth the party's arguments that the magistrate judge's recommendation should be reviewed *de novo* and a different disposition made.  It is insufficient to submit only a copy of the original brief submitted to the magistrate judge, although a copy of the original brief may be submitted or referred to and incorporated into the brief in support of the objection.  Failure to submit a brief in support of the objection may be deemed an abandonment of the objection.

> A magistrate judge's recommendation cannot be appealed to a Court of Appeals; only the district judge's order or judgment can be appealed.

2.      *Transcript (applicable Where Proceedings Tape Recorded)*.  Pursuant to 28 U.S.C. § 1915 and FED.R.CIV.P. 72(b), the Magistrate Judge finds that the tapes and original records in this case are adequate for purposes of review.  Any party planning to object to this recommendation, but unable to pay the fee for a transcript, is advised that a judicial determination that transcription is necessary is required before the United States will pay the cost of the transcript.

---

[18]      Effective December 1, 2009, the time for filing written objections was extended to "14 days after being served with a copy of the recommended disposition[.]" Fed.R.Civ.P. 72(b)(2).